**ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS v. BOUNDS.　(No. 3148.)\***

(Court of Civil Appeals of Texas. Texarkana. March 11, 1926. Rehearing Denied April 8, 1926.)

1. **Master and servant** ☞276(8)—**Evidence held not to show negligence causing death of brakeman by releasing hand brakes and failing to warn him that cars were moving down grade.**

Evidence *held* insufficient to show that act of rear brakeman in releasing hand brakes on cars before engine was actually coupled to them, and failure to warn head brakeman that cars were rolling down grade upon him and to stop the cars by "scotching" wheels thereof, constituted negligence which was real producing cause of death of head brakeman.

2. **Master and servant** ☞286(13)—**Whether couplers measured up to standard set by Safety Appliance Act held for jury (U. S. Comp. St. § 8605 et seq.).**

In action for death of brakeman, crushed between couplers on engine and box car, whether couplers prior to or at time of injury measured up to standard of Safety Appliance Act (U. S. Comp. St. § 8605 et seq.) *held* for jury.

3. **Death** ☞67—**Proof that brakeman killed had reasonable expectancy of being promoted to position of conductor held admissible on question of damages.**

In action for damages for death of brakeman, proof that at time of his death he had a reasonable expectancy of being promoted to position of conductor with increased pay, it being shown that defendant recognized seniority among employees and followed that rule of promotion, *held* admissible.

Appeal from District Court, Smith County; J. R. Warren, Judge.

Action by Mrs. Bessie Bounds against the St. Louis Southwestern Railway Company of Texas. Judgment for plaintiff, and defendant appeals. Affirmed.

See, also, 244 S. W. 1099; 266 S. W. 171.

The appellee, surviving wife of Louis C. Bounds, deceased, brought the suit as temporary administratrix of his estate, to recover damages for the death of the decedent, both those sustained by her as surviving wife and those sustained by the decedent in virtue of the conscious suffering endured by him between the time of his injury and death. Louis C. Bounds was performing the regular duties of a head brakeman on one of appellant's freight trains when he received injuries which resulted in his death about two hours later. He was crushed, as seems to be admitted, between the couplers on the tender of the engine and a box car, while assisting in switching operations at Athens about 3:45 o'clock a. m. of February 6, 1921. The following grounds of negligence are pleaded and relied upon: (1) The tender of the engine and the car were not equipped with automatic couplers, and in reasonably good operating condition, so that they would couple automatically by impact and uncouple without the necessity of a brakeman going between the ends of the tender and car. (2) The negligence of the rear brakeman in (a) releasing the hand brakes on the three cars to be switched before the tender of the engine was actually coupled to the cars; (b) failing to warn Louis C. Bounds before his injury that the three cars to be switched had been set in motion and were rolling down towards the engine; (c) failing to stop the three cars by means of "scotching" their wheels before they had rolled down to the engine in contact with the tender.

The appellant, besides general denial, pleaded and relied upon assumed risk and contributory negligence. The suit was submitted to a jury upon special issues, and in keeping with their findings judgment was entered in favor of the appellee.

It is shown by the evidence that at the time in question the deceased was the regular head brakeman on a freight train of appellant which was run between Waco and Tyler. S. C. Hart was the rear brakeman. It is admitted that the appellant was engaged in interstate commerce at the time of injury, and the deceased was employed as brakeman in such commerce. The train was on its round trip from Tyler. The freight train left Waco at 6:30 p. m. of February 5, 1921, and reached Athens, an intermediate station, about 3:45 a. m. of February 6. At Athens it was necessary to pick up and incorporate into the train three cars out of a string of eight or more cars then standing on a spur track called the "old stock track." The locomotive of the train was run over to and backed upon the spur track, to be coupled to "the first three cars" at the northerly end of the string of cars. It was the duty of the deceased as head brakeman "to make that coupling, couple the air hose there, and see that angle cocks were turned on." The first car in the string of cars, next to the engine and to be coupled to the engine, was a B. & O. box car. As to the three cars to be switched it was the duty of S. C. Hart, rear brakeman, as he says, "to inspect the cars and get them ready to be coupled when the engine backed against them." As testified by Mr. Hart:

"I went over and inspected them, lined up the air, let off the brakes, and set the brake on the fourth car, as my duty required."

On the signal of deceased, the locomotive was then backed to and against the cars, in order to couple and switch out the three cars needed to go into the train. The locomotive was backed carefully and in the usual way to effect a coupling. The track at the place was level and smooth. After the engine had

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

283 S.W.—18　　\*Writ of error dismissed for want of jurisdiction June 9, 1926.

backed and made the impact with the box car, the following occurred, stating it in the words of the engineer:

"He (Bounds) went in and cut the air between the tender and the head car and back to the angle cock. There is an angle cock on the car the same as on the tank. I knew he did cut in the air by my air gauge. It was his duty to do that, and that was the usual and customary way to do it. Hart then gave the signal of go ahead. Bounds at that time was standing off out to the side of the car and the track. Bounds repeated the signal. We were all three on the south side of the engine and cars. When Bounds repeated Hart's go-ahead signal I threw the engine in forward motion, released the air, and started her, and when I did the coupler on the car and the tender of the engine came apart. The air hose came apart, and the brakes on the engine went in extreme emergency because of the reduction in the air line when the hose broke loose. The force of the engine and the extreme pressure threw the engine about 10 feet from the cars. The engine stopped."

The other witnesses testified to the same fact, that when the locomotive moved forward on the signal of Bounds the coupler on the box car and the tender failed to hold, or "pulled loose." As to whether or not the couplers were adjusted to make or effect a coupling by the impact is a matter of opinion or inference. The rear brakeman, who was standing near the place, said:

"When the engine moved off from the cars I don't know whether the coupling had been made or not."

The engineer said:

"I brought the locomotive back properly and in the usual and proper way to effect a coupling. He (Bounds) went in there between the tender and the car after I had made the impact. I thought I had made the coupling between the two cars."

The inference is allowable from the engineer's evidence that the couplers were made ready and the operation of the engine was favorable to make the coupling by impact, and that the couplers "came apart" or became disjoined when the locomotive moved forward. After the locomotive moved off without sufficiently effecting a firm coupling, the following occurred, stating it in the words of the rear brakeman:

"When the coupling came apart, Bounds was on the right-hand side of the train, opposite the coupling, between the tender and the car. His duty was then to regulate the coupling so that it would be made. He went in between the cars. Just after he went in between the cars I heard the slack taking up between the second and third cars, and I heard him holler. The slack took up just about the time or just before he hollered, and the cars moved forward just about the time he hollered. The brakes of the cars did not hold them. If the brakes had been in good condition and had been properly charged with air, they would have

set and held the cars after the air connection was broken. The cars were supposed not to have moved. When the cars moved they moved forward gradually. It was done slowly and gradually and made so little noise I could hardly hear it. The cars rolled about 6 feet. As soon as I heard him holler, I went to him at once. He was lying across the right rail, with his head outside the track, his feet inside the track, and his hips about on the rail. I was the first one to reach him. There was a cut in the right side of the body; he was mashed in the stomach, and mashed and bruised in the right side of the back. He could have been injured as he was by the couplers of the car and the tender catching him between them; that is about the only way he could have been injured like he was. When I got down to Bounds the cars were coupled to the engine."

Further stating the occurrence as the engineer testified to it:

"After the engine stopped, about 10 feet from the cars, Hart was back there by the end of the three cars. Bounds was in behind the tank. I saw that he had turned the angle cock and stopped the flow of air. I then felt a jar, and then heard Louis (Bounds) holler, 'I am fastened, somebody come here.' He hollered this twice. That was the first thing I heard after the cars pulled apart, or rather after he disappeared behind the tank; that was about 10 seconds after I saw the gauge bringing up the air. When I heard Bounds holler, I put my reverse lever in the emergency, got down and went to him. He was loose from the coupler when I got there. Hart and I were there. The cars were apparently coupled at the time I got there after Louis (Bounds) hollered. The knuckles appeared to be meshed and coupled. I did not examine them thoroughly. I do not know whether the cars were actually coupled or not."

The parties appear to admit the fact to be that Mr. Bounds was caught between the couplers and fatally mashed. The inference is quite strong that he was at or by the coupler of the tender of the locomotive facing the engine, when injured, in ignorance of the cars rolling slowly upon him from the rear, and the testimony tends to show that he was at or by the coupler at the time for no other reason than to make adjustments of the couplers, which had failed of firm coupling in the first effort of coupling. A firm or effectual coupling apparently was made, although it may not have "actually coupled," as the engineer and rear brakeman, respectively, said, on the second impact, when the cars rolled to the engine. Whether or not the couplers required adjustment and manipulation for the second impact, and whether or not they were in proper repair and condition, and whether or not there was a necessity to go in between the cars to make adjustment and alignment of the coupler or its appliances, become issuable facts by the evidence according to personal interpretation. The coupler, both on the tender of the engine and on the B. & O. freight car, was a "simplex automatic cou-

pler," a type of coupler commonly used and approved, of simple design and make to effect a coupling by impact, and to effect an uncoupling from the side of the car without the necessity of going between the ends of the cars. The particular couplers had been used on the box car and on the tender of the engine for a time previous to the trip in evidence.

The roundhouse records of repairs made on "engine No. 560," covering a period of time of about 45 days previous to the injury in suit, show the notation by the inspector that on five different occasions the "back coupler takes the gauge," meaning that the knuckles would open as much as 5⅛ inches and likely become disengaged and pull apart. These same records also showed notations made by the inspector that on eleven different occasions the "carrier iron needed to be tightened." The last record, made on February 1, about three days before engine No. 560 was taken out on the trip to Waco, showed that the tender coupler would "take the gauge," and showed on February 4, two days before the injury, the notation "tighten carrier iron." The inference is that the inspection was complete and the defects noted did exist. There is affirmative evidence that the directions noted by the inspector had been observed and the required repairs made. Yet in all the facts and circumstances the inference is allowable, either of bad repair of the appliances, or of the improper working of the adjusting lever, pin, and couplers themselves, requiring manipulation at times for a second impact on the trip in evidence. Shortly after the injury the same engine, with a new crew, returned to Athens to take up the train, and upon its arrival attempted to back in and couple onto this same box car. The coupling again failed to make, but pulled apart, and required, in order to get the coupling made, inside adjustment, as some evidence goes to show. A successful coupling though was actually made on another effort. The inference is allowable that the coupler on this car failed to open wide enough with the first effort in the use of the lever. There is some evidence that "the carrier iron was loose" and the "lip" of the coupler was sprung or out of gauge.

The history of the case appears in the two former appeals, reported in 244 S. W. 1099, and 266 S. W. 171. We conclude, without going further into details, that the evidence in this appeal is slightly stronger than it was on the former appeals, and presents a jury question of whether or not the couplers, one or both, prior to or at the time of injury, measured up to the statutory standard. It can be stated in the words of the appellant's general foreman of the mechanical department:

"You have the information already as to how many times during this period of 45 days the coupler took the gauge. If your memorandum on it shows that the coupler took the gauge five times in that period, your memorandum is in accordance with mine. I think that is correct. I have a memorandum here that the carrier iron needed tightening 11 times during that period, and I think that is just about right. I think it was three times during that period that the sleeve needed fixing. I don't think the record shows the pin lifter brackets needed fixing. * * * It is not unusual for the carrier iron on the tender of a locomotive to be loose; they are loose every trip. It is the drawhead in the rear of the tank that pulls the whole train, and there is a great strain up and down all the way on it. The weight of the train is on it, and that is why it is necessary to tighten it as often as it is. Owing to the great strain, they will and do work loose. You can't hardly keep them tight. To tighten the carrier iron does not mean that there is a defect."

Further, the circumstances are favorable to the inference as to the box car that the "lip" of the coupler was sprung from wear. The following special issues, as material to state, were submitted to and answered by the jury:

"(1) Was the tender of the engine and the car in question, at the time deceased was injured, equipped with automatic couplers and appliances thereof, which in the condition the same then were would couple automatically by impact without the necessity of a person going in between the ends of the tender and the car to adjust or manipulate any appliance of either by hand? Answer: No."

"(3) Was it negligence upon the part of rear brakeman Hart in releasing the hand brakes on the three cars on the occasion in question before the tender of the engine actually was coupled to the cars? Answer: Yes."

"(6) Was the failure, if any, of rear brakeman Hart to warn the deceased that the cars were rolling down the grade, negligence on his part? Answer: Yes."

"(9) Was the failure of the rear brakeman Hart to stop the cars by 'scotching' the wheel or wheels thereof at the time in question negligence? Answer: Yes."

Each distinctive issue was a proximate cause of the death of Mr. Bounds, as found by the jury.

There being evidentiary facts to justify the first finding above, in deference to the answer of the jury, such finding of fact is here adopted, and it is here decided, as done by the jury, that it was the proximate cause of the death of the brakeman Louis Bounds. We conclude that the other three findings above of the jury should not be sustained, as not having sufficient evidence to justify the finding of negligence proximately causing the death.

Marsh & McIlwaine and Bryan Marsh, all of Tyler, for appellant.

Edwards & Hughes, of Tyler, for appellee.

LEVY, J. (after stating the facts as above). The propositions of appellant present the point that the evidence speaks unequivocally of the lack of any substantial evidence upon which to found a legal liability to appellee,

either (1) in any infraction of the Safety Appliance Act, or (2) in any negligence on the part of rear brakeman Hart.

[1] We are of the opinion that the second ground mentioned above should be sustained. A judgment thereon is not and cannot be legally predicated in favor of appellee. The couplers failed to firmly hold at the first effort at coupling, and the effect of the disunion of the couplers in the forward movement of the locomotive was sufficient to cause the cars to move forward slowly, and, as appears, without noise, toward the engine, catching the deceased. The cars were at a complete standstill at the first impact. The rear brakeman's view of Bounds after the impact was partially obscured. But a few seconds of time intervened. In nowise, in the circumstances, was the alleged negligence of the rear brakeman shown to be the real producing cause in an act of misdoing of the death of the head brakeman.

[2] We are of the opinion that the first point mentioned should be overruled, as we conclude that there is evidence in the present record authorizing the jury to determine, as in their province to do, that there was an infraction of the Safety Appliance Act (U. S. Comp. St. § 8605 et seq.) just prior to or at the time of the injury. There was failure of the couplers on the car and the tender of the locomotive to couple by impact in the first effort at coupling at Athens, and also afterward when the new crew returned from Tyler with the same engine. It appears that the locomotive was carefully backed and moved forward in each instance, and the operation was favorable to effect a coupling. The operation of the locomotive did not bear upon the failure of the couplers to couple, or upon the disunion. And there is evidence justifying the inference that the couplers were given fair opportunity to operate by the act of Bounds in the first instance and by the acts of the others in the second instance. By the second effort in the last instance there was a firm coupling, although it required manipulation between the cars in preparation for the second impact. By the second in the first instance when the cars rolled together, it is left uncertain whether or not the couplers "actually couples." It was further shown that, prior to the first impact in question, the coupler on the tender of the engine took "the gauge," meaning that the knuckle would open too wide, as much as five times within the 45 days preceding the day of injury. The "carrier irons" were loose and needed tightening upon several different occasions. The "pin lifter bracket" became loose at one time. The "lip" of the coupler on the box car was sprung, and the "carrier iron" loose. There is also opinion evidence as to the make and type of mechanism and the inherent condition and respecting the operation of the couplers. As shown, generally the coupler will take "the

gauge" from wear, and such condition renders it likely not to stay closed; at times it will operate, and at times it will fail to hold without manipulation between the cars, notwithstanding attempted correction of this tendency by general repair. As testified by the brakeman Gandy in reference to the second failure to couple:

"When the tender pulled loose from the car, it moved 4 or 5 feet and stopped. That which was then done toward effecting a coupling of the tender and the car was, I closed the knuckle on the box car with my hand, pulled the pin on the back of the tank with the pinlifter with my right hand, and finished opening the knuckle with my left hand. * * * The first thing I did or tried to do for this purpose (to get the cars coupled together) was, I raised the pin with the pinlifter on the box car and opened the knuckle with my hand. When I first tried to open the knuckle on the car I pulled the pinlifter with my hand. * * * Yes; I pulled the pinlifter with force that would have opened the knuckle sufficiently for a coupling by impact if the knuckle had opened. I was physically strong and stout. * * * No; I did not solely by means of the lever alone open the knuckle sufficiently for a coupling by impact; I had to use my hand on the knuckle in order to effect the coupling."

Other evidence besides appears in this respect as to the coupler on the box car, and its manipulation. On the other hand, there is evidence going to show, at least to justify a jury to determine, that the coupling on the fender was properly repaired and in workable condition, and that the coupler on the box car worked successfully, and that, properly manipulated, the coupler would hold. When all the facts and circumstances are considered, the determination of whether or not the knuckle of the couplers, one or both, on this trip and the tendency at times to lock and would not open, by reason of wear or condition, requiring manipulation by hand to open same, remains in the domain of open fact, and not of pure law. The coupler on the tender of the locomotive may have been sufficient as a fact to effect a coupling on all the other cars, as well as the particular box car in evidence, during the whole time of the round trip on the road. Yet the coupler on the particular box car as a fact may have been insufficient in virtue of its condition to properly effect at all times a coupling to the tender. Couplers are interdependent, and both of them constitute the whole within the scope of the Safety Appliance Act. We are therefore not inclined to disturb the verdict of the jury on this appeal in their finding of fact of an infraction of the Safety Appliance Act. The circumstances are not entirely unfavorable to such finding of fact. Railway Co. v. Wagner, 36 S. Ct. 626, 241 U. S. 476, 60 L. Ed. 1110; Railway Co. v. Brown, 33 S. Ct. 840, 229 U. S. 317, 57 L. Ed. 1204; Railway Co. v. Gotschall, 37 S. Ct. 598, 244 U. S. 66, 61 L. Ed. 995; Railway Co. v. Powell (Tex.

Civ. App.) 252 S. W. 268; Payne v. Baker (Tex. Com. App.) 258 S. W. 466; Id. (Tex. Civ. App.) 242 S. W. 343; Railway Co. v. Sprole (Tex. Civ. App.) 202 S. W. 985. 'This present appeal is not entirely unsupported by other evidence, besides a single failure to couple, showing an infraction of the act.

[3] There was no error in admitting the evidence that at the time of the death of Mr. Bounds, he had a reasonable expectancy of being promoted to the position of conductor with increased pay; it being shown that appellant recognized seniority among employees and followed that rule of promotion. Hines. v. Glascow (Tex. Civ. App.) 217 S. W. 1114; Railway Co. v. Elliott, 13 S. Ct. 837, 149 U. S. 268, 37 L. Ed. 731. We think the case of Railway Co. v. Elliott, 13 S. Ct. 837, 149 U. S. 266, 37 L. Ed. 728, is applicable only in the case there is an absence of proof of any rule or customary practice of recognizing seniority among employees for promotion.

We have duly considered the other assignments of error, and are of the opinion that each of them should be overruled.

The judgment is affirmed.